[Cite as *State v. Stargell*, 2016-Ohio-5653.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26446 |
| | : | |
| v. | : | Trial Court Case No. 12-CR-1169 |
| | : | |
| ANTHONY STARGELL, JR. | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of September, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

CHRIS BECK, Atty. Reg. No. 0081844, Beck Law Office, L.L.C., 1370 North Fairfield Road, Suite C, Beavercreek, Ohio 45432
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Anthony Stargell appeals from his felony convictions, which include a

conviction for aggravated felony murder. Finding no error, we affirm.

## I. Background

{¶ 2} Tommy Nickles, an electrician, ran his business out of a building near Miami Valley Hospital, in downtown Dayton. The building had a garage in the back and a small office area up front, and adjacent to the office was a separate room with a bed where Nickles often spent the night. Nickles's golden retriever, Rusty, kept him company.

{¶ 3} Around 10:20 p.m., on April 2, 2012, video taken by surveillance cameras outside and inside the garage and in the rear upper-left corner of the office shows Stargell arriving. Nickles was in the office with three people, and Stargell talked with them until the three left a half hour later. As soon as they left, Stargell took a pistol out of a drawer in the office, and Nickles pulled out another pistol and placed it on his desk. Video from the camera shows that Stargell had been there for a few hours earlier that afternoon, and Nickles had shown Stargell the two handguns plus a rifle and shotgun. The two appear to chat amiably, with Nickles sitting behind his paper-strewn desk and Stargell sitting in a chair to his right, a few feet away, holding the pistol. After chatting for a while, Stargell leans back in his chair and gestures to something on Nickles's left. Nickles looks over and appears to search for something under the papers on his desk. Stargell then abruptly jumps up and shoots Nickles twice in the head, killing him. Presently, Rusty pads in from the back wagging his tail. Stargell points the pistol at the dog and fires, killing him too.

{¶ 4} Stargell then rummages through Nickles's pants pockets and desk and takes the money he finds. He pulls the television off the office wall, gathers up the guns, places everything in Nickles's work van, and drives off in the van. He returns an hour later with his cousin, Gerald Pendergrass. The surveillance video ends when Stargell disconnects

the cameras from the DVR players on which the video from the cameras was being recorded. Other evidence shows that after the video ended Stargell gathered up the surveillance equipment, including monitors and the DVR players, and put it in the van. He then poured gasoline around the office and the adjacent room. It was at this point that Pendergrass, who had refused to help, ran away. Stargell put a match to the gas and, as the building burned, pulled away in Nickles's van.

{¶ 5} About a week later, Pendergrass went to the police and told them what he knew about the killing. He also told them that he had seen Stargell at their grandmother's house with surveillance equipment from Nickles's office. While executing a search warrant at the house, police found the surveillance monitors in the basement. In a trash can outside the house, they found the DVR players, from which they recovered the video from the surveillance cameras.

{¶ 6} Stargell was indicted[1] on three counts of aggravated felony murder under R.C. 2903.01(B): Count 1 charged that he killed Nickles while committing aggravated robbery, Count 2 charged that he killed Nickles while committing aggravated burglary, and Count 3 charged that he killed Nickles while committing aggravated arson. Each count carried three death-penalty specifications: murder while committing, attempting to commit, or fleeing after committing aggravated robbery, after committing aggravated burglary, and after committing aggravated arson. R.C. 2929.04(A)(7). Stargell was also indicted on eleven other counts: Counts 4 to 14 charged, respectively, two counts of aggravated robbery, two counts of aggravated burglary, felonious assault, grand theft of

---

[1] The relevant indictment is the June 5, 2012 *Re-indictment "B."*

a motor vehicle, aggravated arson, two counts of tampering with evidence, having weapons while under disability, and cruelty to companion animals. Many of the 14 counts carried a firearm specification.

{¶ 7} The case was tried to a jury.[2] Stargell took the stand and claimed self-defense. He said that he was a drug dealer and that he supplied Nickles with methamphetamine in exchange for allowing him (Stargell) to sell drugs out of Nickles's office. Stargell claimed that on the night of the shooting, he was at Nickles's office because a shipment of drugs was being delivered. While he and Nickles were sitting around, Stargell said, Nickles began accusing him (Stargell) of taking advantage of him, of "getting over on him," telling Stargell that he deserved more of the drug money than what Stargell was giving him. (Sept. 2, 2014 Tr. 72). Stargell told the jury that Nickles told him that he (Nickles) was "done being crossed by me." (*Id.* at 81). When Nickles turned to his desk, said Stargell, he thought that he was reaching for a gun. Stargell said that he was afraid, panicked, and shot Nickles. When the dog came in, Stargell said, he panicked again. Stargell's testimony was the only admissible evidence presented by the defense.

{¶ 8} Stargell was found guilty on all counts. The jury spared him the death penalty and instead recommended life in prison without parole. The trial court merged several of the offenses for sentencing purposes, including the aggravated felony murder offenses. The court sentenced Stargell to life in prison for aggravated felony murder plus 35.5 consecutive years for the other offenses.

{¶ 9} Stargell appealed.

---

[2] The having-weapons charge was tried to the court.

## II. Analysis

{¶ 10} Stargell assigns eight errors to the trial court. Five challenge procedural rulings—refusing to sever the animal-cruelty offense, refusing to allow voir dire questions related to the killing of a dog, rejecting two *Batson* challenges, refusing to grant a mistrial, and refusing to instruct the jury on the offense of voluntary manslaughter. And three assignments of error make evidentiary challenges—the trial court's excluding the testimony of Stargell's expert witness, the sufficiency of the evidence supporting some of the aggravated felony murder verdicts, and the manifest weight of the evidence supporting the aggravated felony murder verdicts. We analyze the assignments of error in an order that facilitates our review and consider first the procedural rulings.

### A. Severance of the animal-cruelty offense

{¶ 11} The eighth assignment of error alleges that the trial court erred by not severing the offense of cruelty to companion animals from the other charged offenses.

{¶ 12} Stargell moved for severance (and reconsideration of severance) before trial, but he never renewed his motion. " 'A motion for severance of counts due to prejudicial misjoinder is waived unless it is renewed at the close of the state's case or at the conclusion of the evidence.' " *State v. Bates*, 2d Dist. Clark No. 2005 CA 83, 2006-Ohio-4146, ¶ 33, quoting *State v. Rutledge*, 2d Dist. Montgomery No. 18462, 2001 WL 587555, *6 (June 1, 2001). *Accord State v. Montgomery*, 2d Dist. Montgomery No. 22193, 2009-Ohio-1415, ¶ 16 (quoting the same); *State v. Day*, 2d Dist. Clark No. 2141, 1986 WL 13241, *2 (Nov. 24, 1986) ("A motion for severance due to prejudicial joinder of offenses must be renewed at the close of the state's case or at the conclusion of all

evidence, to avoid waiving the issue."). Therefore Stargell has forfeited his ability to raise the issue on appeal. We will review the matter for only plain error. *See Montgomery* at ¶ 18 (reviewing for plain error where the defendant did not renew his motion for severance). "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." (Citation omitted.) *State v. Obermiller*, Slip Opinion No. 2016-Ohio-1594, ¶ 62.

{¶ 13} Crim.R. 8 allows joinder of two or more offenses that "are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). But Crim.R. 14 requires severance "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses." Crim.R. 14. "[T]he state can refute prejudice by showing 'that evidence of each of the crimes joined at trial is simple and direct.' " *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 30, quoting *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). If the trial court refuses to sever offenses, "[a] defendant must affirmatively establish prejudice and an abuse of discretion." (Citations omitted.) *State v. Coleman*, 85 Ohio St.3d 129, 136, 707 N.E.2d 476 (1999).

{¶ 14} We find no obvious error in the trial court's refusal to sever the animal-cruelty offense. Stargell does not contend that the animal-cruelty offense was improperly joined along with the other charged offenses committed by Stargell and it is evident that he shot the dog within about ten seconds of the murder as part of the same course of criminal conduct, Crim.R. 8(A). Appellant's argument is that the animal cruelty offense should be severed due to prejudice under Crim. R. 14. But we agree that the jury could easily segregate the evidence supporting the animal-cruelty offense from the evidence

supporting the other joined offenses.[3] The integrally related offenses were captured on explicit video in direct sequence which continued with the Appellant taking money from the victim's desk drawer and searching his pocket. We think that it is very unlikely that the jury confused this with the evidence proving the other joined offenses. The trial court thought the same.[4]

{¶ 15} The eighth assignment of error is overruled.

## B. Voir dire questions about killing a dog

{¶ 16} The seventh assignment of error alleges that the trial court erred by refusing to allow Stargell to ask prospective jurors about their feelings towards a hypothetical defendant who murdered not only an innocent man but also the man's dog.

{¶ 17} During voir dire, defense counsel posed this hypothetical to each prospective juror: "You just went through the trial phase. You're convinced beyond a reasonable doubt that the Defendant killed an innocent victim, not by self defense, insanity, or heated passion. And he is—you found him to be a guilty killer. I want to know what your feelings are about the death penalty under that hypothetical situation." (Aug. 19, 2014 Tr. 57). Counsel then wanted to change the hypothetical by adding "the fact that not only did he kill this man, but he also killed his dog." (*Id.* at 59). Counsel explained that a prospective juror's answer would show whether the juror would be more likely to vote for the death penalty if the dog was killed too. But the trial court would not allow it.

---

[3] The evidence supporting the animal-cruelty offense showed that Stargell "knowingly" killed Rusty "needlessly." R.C. 959.131(B).

[4] The court said that it was "not convinced that the jury would be unduly prejudiced by the consideration of evidence of the animal cruelty charge." *Order and Entry Overruling Defendant's Motion #56* (April 16, 2014).

{¶ 18} This issue is moot because the jury did not vote for the death penalty. *Compare State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227, ¶ 20 (holding that, because the death sentence was vacated on direct appeal, the defendant's argument was moot that if he had presented expert psychological testimony during the mitigation phase, there was a reasonable probability that he would have been spared the death penalty).

{¶ 19} The seventh assignment of error is overruled.

### C. *Batson* challenges

{¶ 20} During jury selection, the State exercised peremptory strikes against two black prospective jurors. Stargell challenged the strikes as racially motivated, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). But the trial court accepted the State's race-neutral explanations and excused the two jurors. The third assignment of error alleges that the court erred.

{¶ 21} "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' " *Foster v. Chatman*, __ U.S. __, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016), quoting *Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). *Batson* "provides a three-step process for determining when a strike is discriminatory: 'First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.' " *Id.*, quoting *Snyder* at 476-477.

{¶ 22} The issue here concerns *Batson*'s third step. "That step turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." *Id.*, quoting *Snyder* at 477. *Accord State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 23 ("We defer to a trial court's resolution of a *Batson* challenge absent a showing of clear error.").

{¶ 23} Stargell's *Batson* claim concerns the strikes of Juror 27 and Juror 33. We turn first to Juror 27.

*Juror 27*

{¶ 24} The State's reason for striking Juror 27 was that her answers to death-penalty questions on her juror questionnaire and during voir dire were equivocal, raising questions about whether she would vote for a death sentence. Juror 27 left most of the death-penalty questions blank on the questionnaire. One of the questions left blank states, " 'Please state any opinion you have in favor of the death penalty and any opinion you have opposed to the death penalty and why.' " (Aug. 22, 2014 Tr. 296). Juror 27 underlined the word "opposed" in the question. The juror did answer a later question that asks the prospective juror to indicate agreement or disagreement with the statement, "the death penalty should sometimes be used as the punishment in certain murder cases." Juror 27 indicated that she strongly agreed. During voir dire, the juror was asked about her questionnaire. The prosecutor asked her how long she had been opposed to the death penalty, and she answered, "Pretty much my life." (Aug. 19, 2014 Tr. 107). In the end, it appears that Juror 27's position was that if a death sentence were justified under the law, she could vote to impose it.

{¶ 25} The Ohio Supreme Court has said that "[u]ncertainty about how a prospective juror perceives the death penalty is a 'race-neutral reason' for exercising a peremptory challenge against her." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 65. Here, the trial court, citing *Were* and the questionnaire, found that the State's race-neutral explanation for striking Juror 27 was not mere pretext for race discrimination.

{¶ 26} The only evidence that Stargell cites in support of his race-discrimination claim is that Juror 27 indicated on her questionnaire that she strongly agreed that the death penalty should be used as the punishment in certain cases. While true, the juror also expressed her strong opposition to the death penalty. The trial court reasonably could have found that Juror 27's views on the death penalty were uncertain. Considering all of the evidence, we cannot say that the court's conclusion is clearly erroneous.

*Juror 33*

{¶ 27} We turn next to the strike of Juror 33. After the State exercised a strike on this prospective juror, defense counsel objected, saying, "This was the juror who we believe was intimidated by the State and we believe that it's being done for racial purposes," (Aug. 22, 2014 Tr. 302). The prosecutor explained that Juror 33 has known Stargell's mother for about ten years and sees her often. The State's concern was "his knowledge and familiarity with the Defendant's mother, and the concern that that caused him with regard to his ability to serve as a juror without that weighing on his mind and his decision-making process." (*Id*. at 303-304). The State was also concerned that "he [Juror 33] sees her often, and talks to people in the community that also may know her." (*Id*. at 304). The State was worried that "the pressure that he may feel as a result of that, as a

juror if he were chosen and seated, could affect his deliberations, not only in the penalty phase, but in the guilt phase as well." (*Id.*). The State's secondary reason for the strike was that Juror 33 was convicted of a felony in Montgomery County and therefore might have a bias against the prosecutor's office.

{¶ 28} The trial court accepted the State's explanation, albeit reluctantly:

> THE COURT: This used to be an easy decision.
>
> (Pause)
>
> THE COURT: The Court finds that these are neither implausible or fantastic justifications presented by the State, but the Judge must assess the plausibility of the prosecutor's reasons in the light of all evidence with a bearing on it. The Court reluctantly overrules this *Batson* challenge * * *.

(*Id.* at 304-305). This reluctance, Stargell contends, shows that the court did not make the correct decision. He says that, in overruling the challenge, the court indicates that it does not believe that the proffered race-neutral explanation is the State's real reason for striking Juror 33. We disagree.

{¶ 29} It is not entirely clear why the trial court expressed reluctance to overrule the *Batson* challenge to Juror 33; it could be merely an expression of sensitivity to the import of a *Batson* challenge. But we find no support that the comment was because the court disbelieved the State's reason for striking the juror. Earlier, the prosecutor had called the juror up to a sidebar and asked him about the prior felony conviction. Defense counsel accused the prosecutor of doing this to intimidate the juror. The State then challenged Juror 33 for cause, and the defense moved to dismiss the jury based on prosecutorial misconduct for bringing the juror to the sidebar simply to go over his

termination entry. The court told the prosecutor to explain its actions and seemed skeptical at the explanation. In the end, the court refused to excuse Juror 33 for cause and took the motion to dismiss under advisement. A few days later, the court overruled the motion, saying that "the excusals of African American jurors in this case were appropriate" and that "there was good and sufficient reason as the Court has earlier found to excuse them." (Sept. 3, 2013 Tr. 28).

{¶ 30} We note too that the State did not attempt to strike all black prospective jurors. Two black women remained on the jury. "The presence of one or more black persons on a jury certainly does not *preclude* a finding of discrimination, but 'the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race.' " (Emphasis sic.) *State v. White*, 85 Ohio St.3d 433, 438, 709 N.E.2d 140 (1999), quoting *United States v. Young-Bey*, 893 F.2d 178, 180 (8th Cir.1990).

{¶ 31} Considering all of the evidence, we cannot say that the trial court's conclusion is clearly erroneous that when the State struck Juror 33 from the jury it was not motivated in substantial part by race.

{¶ 32} The third assignment of error is overruled.

### D. Motion for a mistrial

{¶ 33} The sixth assignment of error alleges that the trial court erred by allowing a witness to open the container in which Nickles's shirt had been preserved and erred by not ordering a mistrial when a loud pop was heard upon opening and a strong odor began to waft through the courtroom.

{¶ 34} Dr. Robert Shott, the deputy coroner and forensic pathologist at the Montgomery County Coroner's Office, testified that he collected the shirt that Nickles was wearing when he was killed and that it was preserved in a clean paint can. The prosecutor presented Dr. Shott with the can and asked him to open it. When Dr. Shott opened the can, there was a loud pop. He then identified the shirt as Nickles's and noted that there was "still an odor of accelerant and something else biologic on it." (Aug. 29, 2014 Tr. 53). The odor filled the courtroom and apparently was so strong that some jurors asked for a recess to let the smell dissipate. The State asked Dr. Shott a few more questions, and then the court took its usual morning recess, perhaps a little earlier than usual. During the recess, Stargell moved for mistrial, which the trial court overruled.

{¶ 35} Stargell first contends that the preserved shirt was not admissible under Evid.R. 403, because the probative value of opening the can and showing the shirt to the jury was strongly outweighed by the prejudicial effect of the odor. But he did not object to the admission of the shirt or the opening of the can at trial, so he waived all but plain error. Crim.R. 52(B). "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." (Citation omitted.) *State v. Obermiller*, 2016-Ohio-1594, at ¶ 62. We see no plain error here. The prosecutor told the court that it did not know that the popping noise would occur or that such a strong smell would be emitted. And defense counsel conceded that this was probably true. So the trial court cannot be expected to have preemptively prevented the opening of the can. The error is not obvious on the record and should not have been apparent to the trial court without objection.

{¶ 36} Stargell next contends that because of the loud pop and strong odor the trial court should have granted a mistrial. He says that the experience could have made such a strong negative impression on the jury that they would have been unable to deliberate on the evidence without bias.

{¶ 37} "Mistrials need to be declared only when the ends of justice so require, and a fair trial is no longer possible. The decision whether to grant a mistrial lies within the trial court's sound discretion." (Citations omitted.) *State v. Ellison*, 2d Dist. Montgomery No. 25638, 2013-Ohio-5455, ¶ 15. Here, we see no reason to believe that Stargell could no longer receive a fair trial because of the sound and odor. "[A]n appellate court is ill-equipped to fully appreciate the prejudicial impact regarding the sense of smell." *State v. Lundgren*, 11th Dist. Lake No. 90-L-15-140, 1993 WL 346444, *7 (Sept. 14,1993). The trial judge here was in the best position to evaluate the situation that occurred in its courtroom and to ascertain what, if any, adverse effect the sound and odor might have had on the jury. After the recess was taken and the trial resumed, the odor had dissipated and no mention of the can or the shirt was ever made again. There is no basis for concluding that the ends of justice required declaring a mistrial as a result of this occurrence. In light of the substantial proof of Stargell's guilt, there is no reason to believe that the sound and odor emitted from the can prejudicially affected the jury's verdict.

{¶ 38} The sixth assignment of error is overruled.

### E. Voluntary manslaughter jury instruction

{¶ 39} The fourth assignment of error alleges that the trial court erred by failing to instruct the jury on the inferior-degree offense of voluntary manslaughter.

{¶ 40} "In a proper case, a jury may consider, in addition to the offense actually indicted, inferior degrees of the indicted offense." *State v. Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶ 20, citing *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph one of the syllabus. "An offense is of an inferior degree if its elements are 'identical to or contained within the indicted offense, except for one or more additional mitigating elements.' " *Id.*, quoting *Deem* at paragraph two of the syllabus.

{¶ 41} "Voluntary manslaughter is an inferior degree of aggravated murder * * *." *State v. Florence*, 2d Dist. Montgomery No. 20439, 2005-Ohio-4508, ¶ 42, quoting *State v. Tyler*, 50 Ohio St.3d 24, 36, 553 N.E.2d 576 (1990). "The mitigating element * * * is that the defendant acted 'while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force.' " *Beatty-Jones* at ¶ 21, quoting R.C. 2903.03(A) (voluntary manslaughter). "A trial court must charge the jury on an inferior offense if the evidence presented at trial reasonably supports, in addition to an acquittal on the indicted offense, a conviction on the inferior offense." *Id.* at ¶ 20, citing *Deem* at paragraph one of the syllabus.

{¶ 42} The analysis of voluntary manslaughter's mitigating element asks first an objective question and second a subjective question. The objective question is whether the victim's provocation was " 'sufficient to arouse the passion of an ordinary person beyond the power of his or her control,' " *id.* at ¶ 22, quoting *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992), "or described differently, whether the provocation was 'reasonably sufficient to bring on extreme stress and * * * to incite or arouse the defendant into using deadly force,' " *id.*, quoting *Deem* at paragraph five of the syllabus. The

subjective question is "whether this particular defendant was in fact acting under a sudden passion or in fit of rage." (Citation omitted.) *Id.* We have said that "[w]hen analyzing the subjective prong of the test, 'evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v. Stewart*, 10th Dist. Franklin No. 10AP-526, 201[1]-Ohio-466, ¶ 13; *see also State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.").

{¶ 43} The trial court here refused to give a voluntary-manslaughter instruction because it found no evidence supporting the offense's mitigating element, that Nickles provoked Stargell to act in a sudden passion or fit of rage. But Stargell cites his testimony that, just before the shooting, Nickles was accusing Stargell of taking advantage of him and that Stargell believed that Nickles was reaching for a gun. Stargell argues that based on this evidence the jury could have found that Nickles's accusations sufficiently provoked him to act in sudden passion or rage.

{¶ 44} Even were to assume provocation (an assumption without evidentiary support), Stargell testified that he acted out of fear:

Q        * * * When did you become afraid of what Mr. Nickles was doing?

A        When he said that he was done being crossed, that's when I actually

was afraid. * * * He said, "I'm done being crossed by anyone," and reached

over. That's when I hopped up and I fired shots at him.

(Sept. 2, 2014 Tr. 123.) Stargell consistently said that he shot Nickles because he was

afraid. *See, e.g., id.* at 72-79. Nothing in Stargell's testimony about what Nickles said and did would lead a reasonable fact finder to believe that when he shot Nickles, Stargell was under the influence of a sudden passion or fit of rage. Thus the trial court properly refused to instruct the jury on voluntary manslaughter. *See Beatty-Jones*, 2011-Ohio-3719, at ¶ 23-30 (concluding the same where the defendant's testimony showed that he shot the victims out of fear, not under a sudden passion or in fit of rage).

{¶ 45} The fourth assignment of error is overruled.

### F. Excluding the testimony of Stargell's expert

{¶ 46} The first of the assignments of error making an evidentiary challenge, the fifth assignment of error, alleges that the trial court erred by excluding testimony from a psychologist about Stargell's neurological deficits, testimony that Stargell says supports his claim of self-defense. "We will not disturb a trial court's evidentiary rulings unless we find 'an abuse of discretion that has created material prejudice.' " *Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, at ¶ 53, quoting *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 43.

{¶ 47} Stargell proffered the testimony of Dr. Bob Stinson, a forensic psychologist who had evaluated Stargell. Dr. Stinson's proferred testimony is that he had talked with Stargell for over five hours and reviewed as many of Stargell's medical, psychological, and educational records as he could get. Dr. Stinson also had a PET scan done of Stargell's brain. According to Dr. Stinson, the scan shows neurological deficits:

> [H]is PET scan was consistent with somebody who has the conditions that
> Anthony has documented in his records which is a mental impairment,
> traumatic brain injury, something along those lines. And the impairment that

you see in those types of individuals, types of individuals that have the PET scan that he had are what we refer to as executive functioning deficits. So they have problems with impulse control. They have problems with judgment. They have problems with reasoning and planning. And then also that kind of PET scan profile is consistent with a person who has a psychotic disorder which is what Anthony's been diagnosed with in the past. And those people in addition have what we call emotional cognition deficits, so they have difficulty reading and responding appropriately to other people's emotional cues, their emotional expressions.

(Sept. 2, 2014 Tr. 132). Dr. Stinson said that these neurological deficits would affect Stargell's reaction to threatening situations: "I would expect given what I know about his psychiatric condition, his neuropsychological impairments, his PET scan results, that he would have impulse control problems. He would have reasoning and judgment problems. And he would have difficulty responding to emotional expressions." (*Id.* at 133).

{¶ 48} In its ruling, the trial court relied on the Ohio Supreme Court's decision in *State v. Nemeth*, 82 Ohio St.3d 202, 694 N.E.2d 1332 (1998), which concluded that expert psychological testimony concerning a child with battered-child syndrome was admissible because the testimony was relevant to the defendant's claim of self-defense and met the evidentiary requirements of Evid.R. 702. The trial court said that *Nemeth* allows psychological testimony in support of a self-defense claim only in cases with evidence of a history and pattern of child or spousal abuse involving the defendant. In this case, said the court, there is no evidence that Nickles ever abused Stargell and nothing in Dr. Stinson's proffered testimony shows any pattern of abuse involving Stargell.

{¶ 49} Stargell argues that *Nemeth* does not limit expert psychological testimony in support of a self-defense claim to cases involving battered children or spouses. Dr. Stinson would have testified, says Stargell, that the scans taken of his brain show the effects of childhood abuse. Which, Stargell says, would have shed light on his response to threatening situations, like the one in Nickles's office, and would have helped the jury understand his claim of self-defense.

{¶ 50} "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." (Citation omitted.) *Nemeth* at 207. To establish self-defense, the defendant must prove that he had " 'a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force.' " *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 258, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Although different permutations describing the nature of the test for self defense appear in some of our case law, the test "is a combined subjective and objective test." *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). The defendant's belief must be objectively reasonable under the circumstances and he must subjectively believe he needed to resort to deadly force to defend himself. *Id.* "[T]he defendant must have had reasonable grounds to believe, and an honest belief, that such force as was used was necessary to protect himself." *State v. Kucharski*, 2d Dist. Montgomery No. 20815, 2005–Ohio–6541, ¶ 18.

{¶ 51} Evid.R. 702(A) provides that, to be admissible, an expert witness's testimony must "either relate[] to matters beyond the knowledge or experience possessed by lay persons or dispel[] a misconception common among lay persons." Accordingly,

"[e]xpert testimony is inadmissible under Evid.R. 702(A) if it concerns matters 'within the ken of the jury.' " *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 17, quoting *State v. Johnson*, 10th Dist. Franklin No. 02AP-373, 2002-Ohio-6957, ¶ 37.

{¶ 52} The determination of whether a defendant has a reasonable belief that he was in imminent danger of death or great bodily harm is not beyond the comprehension of the average juror. *See State v. Coulter*, 75 Ohio App.3d 219, 228-229, 598 N.E.2d 1324 (12th Dist.1992). Indeed, we have held that opinions about the effect of a defendant's psychological makeup on her perception that she was in fear of great harm or death would invade the province of jury. *State v. Taylor*, 2d Dist. Montgomery No. 15119, 1996 WL 417098 (July 26, 1996) (excluding expert testimony for this reason). So except for cases involving battered-woman or -child syndrome or the insanity defense, "[e]xpert testimony ordinarily may not be admitted to establish a self-defense claim." *Gott* at ¶ 19. This claim "is usually best established by the testimony of the defendant." (Citation omitted.) *Id.* at ¶ 18.

{¶ 53} In addition, in this case the proffered testimony of Dr. Stinson would be to the effect that the perceived need for Stargell to use deadly force could have been *reasonable to Stargell* because of his mental deficits. But that would make the question whether use of deadly force is reasonable a subjective analysis when it should be objective. A person who erroneously believes everyone he encounters who is left handed is going to kill him may have a subjective belief he must defend himself but because his belief is not reasonable he cannot avail himself of the self defense justification. Stinson's testimony about Stargell would cloud this distinction, potentially confuse the jury about self defense and invade the province of the jury to evaluate what is objectively reasonable.

We conclude the trial court properly excluded Dr. Stinson's testimony.

{¶ 54} The fifth assignment of error is overruled.

### G. The sufficiency of the evidence supporting aggravated murder

{¶ 55} The first assignment of error alleges that the State presented insufficient evidence to find Stargell guilty of the aggravated-felony-murder offense charged in Count 1, killing while committing aggravated robbery, or to find him guilty of the aggravated-felony-murder offense charged in Count 3, killing while committing aggravated arson.

{¶ 56} To prove aggravated felony murder, the State must prove that the defendant killed the victim "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit," one of several enumerated felonies, including aggravated robbery, aggravated burglary, and aggravated arson. R.C. 2903.01(B). Stargell contends that the evidence does not show that he killed Nickles *while* committing robbery or arson. Rather, he says that the evidence shows that he killed Nickles *before* committing these offenses. And Stargell says that there is no evidence that, before the killing, he intended to commit either felony.

{¶ 57} Stargell was also found guilty of aggravated felony murder for killing Nickles while committing aggravated burglary, the offense charged in Count 2. The three aggravated murder offenses merged, and the State elected sentence on Count 2. Stargell here challenges the sufficiency of the evidence only as to Counts 1 and 3, so we assume that the evidence as to Count 2 is sufficient. "When a trial court dispatches with a count through merger, any error in the jury's verdict on the merged count is rendered harmless beyond a reasonable doubt." *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 70, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990);

*State v. Montgomery,* 10th Dist. Franklin No. 13AP-512, 2014-Ohio-4354, ¶ 39 (quoting the same). Thus we need not address Stargell's sufficiency arguments.

**{¶ 58}** Were we to address them, we would find the evidence sufficient. Stargell appears to misunderstand the meaning of "while" in the aggravated-murder statute. " '[T]he term "while" does not indicate * * * that the killing must occur at the same instant as the [predicate felony], or that the killing must have been caused by the [felony].' Nor does it mean that the felony must have been the motive for the killing." (Citations omitted.) *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 55, quoting *State v. Cooper*, 52 Ohio St.2d 163, 179-180, 370 N.E.2d 725 (1977), *judgment vacated on other grounds in Cooper v. Ohio*, 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157 (1978). "Rather, 'while' means that 'the killing must be directly associated with the [felony] as part of one continuous occurrence * * *.' " *Id.*, quoting *Cooper*, at 179-180. That is, " 'the death must occur as part of acts leading up to, or occurring during, or immediately subsequent to the [relevant felony].' " *Id.*, quoting *State v. Williams*, 74 Ohio St.3d 569, 577, 660 N.E.2d 724 (1996). And the intent to commit the predicate felony does not need to precede the murder. The Ohio Supreme Court has applied the felony-murder rule even though the killing was accomplished before the predicate felony and even though the evidence did not suggest that the intent to commit the felony was formed before the killing:

> [E]ach of the crimes of which [the defendant] was convicted occurred during one continuous incident. Accordingly, [the defendant] should not be able to escape the felony-murder rule by claiming the rape [the predicate felony] was merely an afterthought. * * * In this case, the murder of [the murder victim] was "associated" with the attempted rape of [the rape victim] "as part

of one continuous occurrence."

*Williams* at 577. Similarly, the evidence here shows that Stargell's killing of Nickles was "associated" with the predicate offenses "as part of one continuous occurrence."

**{¶ 59}** The first assignment of error is overruled.

### H. The manifest weight of the evidence supporting aggravated murder

**{¶ 60}** Lastly, the second assignment of error alleges that Stargell's conviction for aggravated felony murder is against the manifest weight of the evidence.

**{¶ 61}** "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Citation omitted.) (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* (6 Ed.1990), 1594. The test is familiar: " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

**{¶ 62}** Stargell first contends that the jury lost its way in finding him guilty of the aggravated-felony-murder offenses charged in Count 1 and Count 3 by finding that he killed Nickles *while* committing the predicate offenses. As we have already said, because these counts were merged, any error in the verdicts is harmless beyond a reasonable

doubt. Regardless, the evidence strongly supports the jury's finding on the while-committing element of not only the aggravated-felony-murder offenses charged in Counts 1 and 3 but also the one charged in Count 2.

{¶ 63} Stargell also contends that the jury lost its way in rejecting his claim of self-defense. " 'To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 258, quoting *Barnes*, 94 Ohio St.3d at 24, 759 N.E.2d 1240.

{¶ 64} Stargell told the jury that he believed that Nickles was going to shoot him and that his (Stargell's) only recourse was to shoot first. Stargell said that in the minutes leading up to the shooting, Nickles began accusing Stargell of "getting over on him" by not giving Nickles what he felt he deserved from the drug sales that Stargell was making from Nickles's business. Stargell said that when he saw Nickles searching around his desk, he thought Nickles was reaching for a gun. He panicked and shot Nickles twice in the head in self-defense. But the jury also saw the surveillance-camera video of the shooting and the events that preceded and followed the shooting. Little in the video suggests that a dispute was going on immediately before Stargell shot Nickles. And immediately after, the video shows Stargell calmly rifling through Nickles's belongings and taking his money, television, and guns. The jury also heard Patricia Hayslip, who met Stargell in Nickles's office earlier in the evening, testify that Stargell told her, " 'I kill people

for a living. That's what I do. I'm a killer. For $100, I will kill anybody. For $125, I will put a bullet between your eyes.' " (Aug. 27, 2014 Tr. 73).

{¶ 65} The jury saw and heard Stargell testify, judged his credibility, and weighed his testimony against the other evidence. That his life was on the line casts suspicion on the truth of Stargell's testimony about what went on between him and Nickles before the shooting. There is no audio accompanying the surveillance video, and Stargell and Nickles were alone. Stargell's testimony is all there is supporting his claim of self-defense. Given the evidence, we cannot say that the jury lost its way by not believing Stargell.

{¶ 66} The second assignment of error is overruled.

### III. Conclusion

{¶ 67} We have overruled each of the assignments of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FAIN, J., concurring:

{¶ 68} I write separately concerning the fourth assignment of error. I agree that the trial court could reasonably conclude that no reasonable jury would find, on the evidence presented, that Stargell was acting while under the influence of sudden passion or in a sudden fit of rage. For that reason, I would overrule the fourth assignment of error.

{¶ 69} But I reject any implication that acting under the influence of rage and acting under the influence of fear are mutually exclusive, so that if one is acting out of fear, one cannot also be acting under the influence of rage. My life experiences instruct me that, to the contrary, rage is often prompted by ones fear of losing something of great value, an intense romantic relationship, or life-sustaining employment, for example.

DONOVAN, P.J., concurring:

{¶ 70} I write separately to comment on the fifth assignment of error.

{¶ 71} Stargell makes an interesting argument that Dr. Stinson should have been permitted to testify. However, *Nemeth* has never been extended beyond a battered woman or child syndrome defense. This is not the case to do it.

{¶ 72} Significantly, the totality of evidence in this record does not dictate such an expansion of *Nemeth*.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Andrew T. French
Chris Beck
Hon. Gregory F. Singer