[Cite as *State v. Gray*, 2016-Ohio-5869.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 26473 |
| | : | |
| v. | : | Trial Court Case No. 13-CR-3237 |
| | : | |
| CURTIS R. GRAY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of September, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Boulevard, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Curtis Gray appeals from his conviction for murder. Finding no error, we

affirm.

## I. Background

{¶ 2} Around 12:40 a.m., on October 10, 2013, a woman watching television in her home on Quitman Street in Dayton heard screams for help coming from the abandoned house next door: "Help me. Please help me. Call the police. He's killing me." (Trial Tr. 198). The woman called 911. The first police officer to arrive saw Gray with a knife in his hand kneeling over the body of Daniel Mooty. When Gray saw the officer, he dropped the knife and fled. The officer soon caught Gray and arrested him. Mooty was pronounced dead at the scene. The coroner's examination of the body revealed at least 110 stab wounds.

{¶ 3} Gray was indicted on October 18, 2013, on three counts of murder (purposely causing death, R.C. 2903.02(A); causing death as a proximate result of committing felonious assault with a deadly weapon, R.C. 2903.02(A) and 2903.11(A)(2); and causing death as a proximate result of committing felonious assault by serious physical harm, R.C. 2903.02(A) and 2903.11(A)(1)). Gray's defense at his jury trial was self-defense. He took the stand and told the jury that Mooty attacked him and that he (Gray) believed that Mooty was going to kill him. Gray wanted to present the testimony of a forensic psychopathologist to explain that his (Gray's) reaction to the threat posed by Mooty may be explained by the abuse that he suffered during his childhood. But on the State's motions in limine, the trial court ruled that this testimony was not admissible.

{¶ 4} The jury rejected Gray's self-defense claim and found him guilty on all counts. The counts merged, and the State elected sentencing on purposeful murder. The trial court sentenced Gray to prison for 15 years to life.

{¶ 5} Gray appealed.

## II. Analysis

{¶ 6} Gray assigns two errors to the trial court. The first assignment of error alleges that the court erred by sustaining the State's motions in limine to exclude the expert testimony on self-defense. And the second assignment of error alleges that the verdicts are against the manifest weight of the evidence. We begin with the second assignment of error.

## A. The weight of the evidence

{¶ 7} In a weight-of-the-evidence challenge, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 8} There is no question that Gray murdered Mooty. The only question is whether Gray acted in self-defense. " 'To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force; and (3) that the defendant did not violate any duty to retreat or

avoid the danger.' " *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 258, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002). Often missing from quotations of the self-defense formulation is the requirement that the force used be reasonable. A person is only privileged to use that force which is reasonably necessary to repel the attack:

> Another component contained within the second element is the defendant's bona fide belief that the use of force was "reasonably necessary to repel the attack." [*State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416, ¶ 23], citing *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990), citing *State v. McLeod*, 82 Ohio App. 155, 157, 80 N.E.2d 699 (9th Dist.1948). In other words, a defendant must show that "that the degree of force used was 'warranted' under the circumstances and 'proportionate' to the perceived threat." *Hendrickson* at ¶ 31, citing *State v. Palmer*, 80 Ohio St.3d 543, 564, 687 N.E.2d 685 (1997). "If * * * the amount of force used is so disproportionate that it shows an 'unreasonable purpose to injure,' the defense of self-defense is unavailable." *State v. Macklin*, 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, 2011 WL 208315, ¶ 27, quoting *State v. Speakman*, 4th Dist. Pickaway No. 00CA035 (Mar. 27, 2001). *Accord State v. Kimmell*, 3rd Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 20, quoting *Hendrickson* at ¶ 33 ("Self-defense * * * is inappropriate if the force used is 'so grossly disproportionate as to show revenge or as criminal purpose.' "). "[I]t is only when one uses a greater degree of force than is necessary under all the circumstances that it is not justifiable on the ground

of self-defense." *McLeod*, 82 Ohio App. at 157.

*State v. Waller*, 4th Dist. Scioto Nos. 15CA3683 & 15CA3684, 2016-Ohio-3077, ¶ 26. In Gray's case, the trial court correctly instructed the jury, consistent with *Ohio Jury Instructions*, CR Section 421.23(3) (Rev. Aug. 16, 2006), that "[i]f [the] defendant used more force than was [reasonably] necessary and if the force used [was] greatly disproportionate to the apparent danger, then the defense of self-defense is not available." (Trial Tr. 625).

{¶ 9} The burden of proof to prove this affirmative defense is on the defendant. R.C. 2901.05(A). " 'If the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense.' " (Emphasis sic.) *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 73, quoting *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986).

*The State's evidence*

{¶ 10} The State presented the testimony of the woman who called 911 and two Dayton police officers who arrived first at the scene of the murder. It also presented testimony from an evidence technician and a paramedic about what they saw at the scene. The State called the coroner to testify about the stab wounds that he found on Mooty's body and called a forensic scientist to testify about her examination of some of the evidence.

{¶ 11} The woman who called 911 testified about what she heard. She said that she heard a man screaming "Help me. Please help me. Call the police. He's killing me." (Trial Tr. 198). She said that the man continued to scream but his cries grew quieter. Four

to five minutes later, said the woman, the cries stopped.

{¶ 12} Officer Christopher Page was the first on the scene. Officer Page said that he saw Gray, knife in hand, kneeling over Mooty's body. Officer Page identified himself as a police officer and told Gray to drop the knife. Gray complied and then took off running. When Page caught up with him, Gray had already climbed over one fence and was trying to climb over another. Page pointed his gun at Gray and ordered him to the ground, which Page had to do several times before Gray finally came down from the fence. Gray put his hands in the air and said, "Okay, I give up." (Trial Tr. 226). Gray then said, "This is a crime of passion." (*Id.* at 226-227). Officer Page ordered Gray onto his stomach, and Gray again said, "this is a crime of passion," (*Id.* at 227). When Page searched Gray, he found Mooty's hospital wristband in Gray's pants pocket. Officer Robert Clever, who arrived soon after Officer Page, also testified about the arrest. Clever said that when Page caught up with Gray, Gray said, "This is a crime of passion." (*Id.* at 250-251). "[T]hree or four times," said Clever, "he [Gray] told us, he said, 'Guys, this is a crime of passion. I'm telling you it's a crime of passion.' " (*Id.* at 251).

{¶ 13} Evidence technician Craig Stiver, also a Dayton police officer, testified that he found Gray's glasses down the fence line on the opposite side of the house from where Mooty lay. He said that the glasses were bent. Stiver also said that Gray's jacket had white stains on the back, likely from the peeling paint on the house. Officer Stiver said that if someone were to travel from the spot where Mooty's body lay along the back of the house to the spot where he found Gray's glasses (as Officer Page said Gray did), it is "very possible" that the person would brush up against the house and get white flakes of paint on their jacket. (*Id.* at 334-335).

{¶ 14} Paramedic George Green was the first to examine Mooty at the scene and testified about what he saw. Green said that Mooty was laying on his right side with his left side facing up. Mooty's arm was laying across his head, covering his face, and his shirt was raised, exposing his abdomen. Green described the wounds that he saw: "His abdomen had been eviscerated. His bowels were hanging out. On his lower right quadrant, there were open cavities in the lower left quadrant that just—nothing had made its way out of yet. There was a large cavity about two ribs up, a large wound where we could see right into his chest cavity, maybe two inches in diameter." (*Id.* at 265).

{¶ 15} The chief deputy coroner at the Montgomery County Coroner's Office, Dr. Lee Lehman, testified about his examination of Mooty's body. Dr. Lehman said that Mooty was 6-feet-1-inch tall and weighed 212 pounds. Mooty had cocaine and alcohol in his system when he died, though Dr. Lehman admitted that the amount of either could not be accurately determined. Mooty died of multiple stab and incised wounds, said Dr. Lehman—at least 110 of them, a conservative count. Lehman explained that there were overlapping stab wounds, where the knife pierced the body more than once in the same spot. These he counted as a single wound. Dr. Lehman noted 42 stab wounds to Mooty's chest and abdomen, five of which pierced his lung and four that pierced his heart; 19 stab wounds to his head and face, four of which penetrated Mooty's skull, three that went through his skull, and one that cut through his cheek and neck and pierced his voice box and larynx; 8 stab wounds to Mooty's stomach, with one penetrating his large intestine and five penetrating his small intestine; 17 stab wounds to Mooty's left leg; and 2 stab wounds to his back. The four stab wounds to Mooty's heart, said Dr. Lehman, were fatal.

He said that typically a person stabbed in the heart will become weaker and weaker until the person passes out and eventually dies. It was Dr. Lehman's opinion that once Mooty's heart was stabbed he had about 30 seconds of conscious activity and that he likely died in about four minutes. Dr. Lehman noted that most, if not all, of the wounds are on Mooty's left side. Lehman said that this is consistent with Mooty laying on his right side, with his left side exposed. Also, despite having been stabbed at least 42 separate times in the chest and abdomen, Mooty's shirt had only 3 holes in it. Dr. Lehman also found 17 stab wounds to Mooty's left forearm and 15 stab wounds to his right hand and wrist. Which, Lehman said, are consistent with defensive wounds.

{¶ 16} Lastly, Emily Draper, a DNA forensic scientist at the Miami Valley Regional Crime Laboratory, testified about her examination of the clothing that Gray wore. She said that there was mud on the knees of Gray's pants but none on the back. She found Mooty's blood on Gray's hands and on the sleeves of his jacket, but nowhere else except for a small amount on the back of his pants and on the inside hem of the back of his shirt.

*The defense's evidence*

{¶ 17} Gray took the stand in his own defense and testified about what happened. He said that after having multiple drinks at multiple bars he was walking home from work in the Oregon District when Mooty, who Gray knew as a local panhandler, asked him for money. After telling Mooty no, Mooty started following him home. Gray said that after being followed for several blocks, he decided to take a detour into the neighborhood near the intersection of Wayne and Wyoming Streets in order to try and lose Mooty or tire him out. Gray said that after several more blocks he heard behind him breathing and shoes scraping on the sidewalk. He looked back and saw that Mooty was within arm's reach of

him, so he took off running. Gray took only two or three steps before Mooty pushed him to the ground. He fell on the grass on his hands and knees, and his glasses flew off. Gray got up and ran toward an abandoned house. When he neared the house, Mooty pushed him, and Gray's back hit the side of the house. Then Mooty forced Gray to the ground onto his back. Gray yelled out, " 'Help, stop, he's trying to kill me.' " (Trial Tr. 548). Standing over Gray, Mooty said, " 'I'm going to get something tonight.' " (*Id.* at 545). Then Mooty straddled Gray, holding him down. Gray said that he believed Mooty was going to kill him: "I felt that if I didn't get away he was going to kill me," (*Id.* at 546); "I believed that he was trying to kill me because he had me on the ground, on top of me, against the wall with his hands on me, and coupled with the fact that he had followed me this entire way," (*Id.* at 565). Gray admitted that he did not see a weapon. While he said at trial that he had heard a rumor that Mooty carried a box cutter, Gray said that he did not remember thinking about this that night. With Mooty on top of him holding him down, Gray pulled out a knife (which he had started carrying after being mugged a year before) from his left pants pocket and stabbed Mooty's left leg. Gray continued to stab Mooty, but according to Gray, Mooty did not stop the attack. Mooty tried to grab the knife and Gray's wrist and throat. Gray said that Mooty was on top of him the whole time and that Mooty never reacted to being stabbed. Finally, Gray managed to roll Mooty off. Since Mooty did not try to get back up, said Gray, he stopped stabbing. Shortly after, a police officer appeared and told Gray to drop the knife. Gray said that he did not remember what happened next.

{¶ 18} Gray agreed that he had Mooty's blood on only his jacket, the back of his shirt, his hands, and the handle and blade of the knife. And he admitted that he had no injuries at all. Gray said that he is 5-feet-10-inches tall and weighed 175-180 pounds. He

denied taking the wrist band that Officer Page found in his pocket, claiming that the band was planted on him.

{¶ 19} The defense also presented the testimony of four witnesses who said that they knew Mooty as an aggressive panhandler who was frequently in the area of the restaurant where Gray worked. One witness testified that she saw Mooty following Gray that night, shortly before the murder occurred.

*The weight of the evidence*

{¶ 20} In his argument, Gray cites the evidence that Mooty had a reputation as being aggressive and that Mooty was following him that night. Gray also points out that his glasses were found a good distance away from Mooty's body. Gray says that the evidence, including the location and direction of Mooty's wounds, support his account of the events—that Mooty was on top of him, that Gray was defending himself, and that Mooty only got off Gray after Gray had repeatedly stabbed him. Gray also says that the white markings on the back of his jacket show that Mooty shoved him into the side of the house. Finally, Gray cites the coroner's testimony that Mooty could have kept fighting for seconds or even minutes after being stabbed in the heart.

{¶ 21} "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 65, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." (Citation omitted.) *Id.* at ¶ 67. Here, there are no real conflicts in the evidence. Only two people know what happened between Gray and Mooty,

and one of them is dead. Gray did not dispute the details of his capture, because he does not remember what happened after he ran. In this case, then, the jury simply did not believe Gray's account.

{¶ 22} Several inconsistencies between Gray's account and other evidence make it reasonable for a jury not to believe Gray's version of events. That Gray fled when he saw Officer Page undermines his claim of self-defense. Also, when he was finally caught, Gray never mentioned being attacked by Mooty or having acted in self-defense. Rather, he said several times that, "This is a crime of passion." (Trial Tr. 226-227, 251). Gray said that he stopped stabbing Mooty as soon as Mooty stopped his attack. The jury could have reasonably concluded that it was not necessary for Gray to stab Mooty 110 times before Mooty finally let go. And if Mooty were pinning Gray down and putting his hands on Gray's throat the entire time as Gray said, it is hard to explain why Mooty had defensive wounds on his forearm and hand. According to Gray, his glasses were knocked off when Mooty pushed him down the first time, which would have been near the sidewalk. But Gray's glasses were found on the opposite side of the house, along the fence, nowhere near the spot where he was pushed. This is consistent with them falling off while Gray was climbing over the fence during his flight from Officer Page.

{¶ 23} It is the physical evidence that calls Gray's account into question the loudest. Gray testified that the entire time that he struggled with Mooty he was lying on his back with Mooty on top. This would mean that Gray made 110 holes in Mooty's body— including in his arms, hands, stomach, abdomen, chest, face and head—all while Mooty leaned over him. Yet most of the blood was found only on Gray's hands and sleeves. It would be reasonable to think that Mooty's blood should have been smeared all over Gray.

Moreover, no mud or dirt was found on the back of Gray's pants or jacket—only on the knees of his pants. Furthermore, Mooty's shirt had only three holes in it, despite having been stabbed at least 42 separate times in the chest and abdomen. And almost all of the stab wounds were found on Mooty's left side. What is more, the coroner found 17 stab wounds in Mooty's left forearm and 15 stab wounds in his right hand and wrist. All of this evidence suggests that Gray did not stab Mooty from below but from above. It suggests that Gray kneeled beside a prone Mooty laying on his right side, with his left side facing up, and that Mooty tried to protect himself with his right hand and by holding his left arm over his head and face. Indeed, these are the positions in which Officer Page first saw them.

{¶ 24} The jury did not lose its way simply because it did not believe Gray's account. *Compare White*, 2005-Ohio-212, at ¶ 69 ("The jury in this case did not lost its way simply because it chose to believe the State's witnesses and disbelieve Defendant, which it was entitled to do."). On this record, the jury could have reasonably concluded that the force that Gray used was disproportionate to the threat that Mooty posed. The manifest weight of the evidence is not against the jury's finding that Gray did not act in self-defense.

{¶ 25} The second assignment of error is overruled.

### B. The admissibility of psychological testimony

{¶ 26} To help prove his claim of self-defense, Gray sought to present the expert testimony of Dr. Mary M. Melton, a certified forensic psychopathologist, who had examined Gray and prepared a written report. In her report, Dr. Melton states that Gray had a rough childhood, suffering neglect and physical, emotional, and possibly sexual

abuse at the hands of his mother and her various boyfriends. It was Dr. Melton's opinion that Gray's childhood experiences explain his extreme response to the threat posed by Mooty.

**{¶ 27}** The State filed motions in limine to preclude Dr. Melton from testifying. On the first day of trial, the trial court sustained the motions, giving its reasons on the record. The court said that it had reviewed Dr. Melton's written report and that most of her opinions supported the partial defense of diminished capacity, which involves expert testimony that the defendant's abnormal mental condition shows that the defendant did not have the specific mental state required for the crime, though he was aware that his action was wrong and was able to control it, *State v. Wilcox*, 70 Ohio St.2d 182, 185, 436 N.E.2d 523 (1982). But in Ohio, diminished capacity is not a defense. *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 66. And Gray concedes that Dr. Melton could not testify about those aspects of her report.

**{¶ 28}** The court also ruled that Dr. Melton's opinions supporting Gray's claim of self-defense were inadmissible. The second element of a self-defense claim is " 'that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of such force.' " *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 258, quoting *Barnes*, 94 Ohio St.3d at 24, 759 N.E.2d 1240. The trial court here said that expert testimony on this element is generally admissible only in cases of battered-woman or battered-child syndrome in which the defendant was abused by the "victim."

**{¶ 29}** Although he objected to the trial court's ruling "for the record," Gray did not proffer Melton's testimony during his case-in-chief or ask the trial court to reconsider its

ruling or otherwise seek to admit the testimony. "[A] ruling on a motion in limine may not be appealed and * * * objections to the introduction of testimony or statements of counsel must be made during the trial to preserve evidentiary rulings for appellate review." *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34. "Absent a proffer of the disputed evidence when the issue is actually reached during trial, even a renewal of a motion in limine on the record prior to opening statements does not preserve the claimed error." (Citation omitted.) *Estate of Beavers v. Knapp*, 175 Ohio App.3d 758, 2008-Ohio-2023, 889 N.E.2d 181, ¶ 69 (10th Dist.). By failing to preserve this issue, Gray forfeited his right to object on appeal. We do however have Melton's report and also conclude that if we did review the trial court's ruling, we would find no error.

{¶ 30} "Expert testimony ordinarily may not be admitted to establish a self-defense claim." *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 19. Evid.R. 702(A) requires expert testimony to "either relate[] to matters beyond the knowledge or experience possessed by lay persons or dispel[] a misconception common among lay persons." Ohio courts uniformly hold that expert testimony supporting the second element of a self-defense claim does not satisfy Evid.R. 702(A), because " ' "the question of reasonableness is quintessentially a matter of applying the common sense and the community sense of the jury to a particular set of facts and, thus, it represents a community judgment." ' " *State v. Johnson*, 10th Dist. Franklin No. 02AP-373, 2002-Ohio-6957, ¶ 38, quoting *State v. Salazar*, 182 Ariz. 604, 610, 898 P.2d 982 (App. 1995), quoting *Wells v. Smith*, 778 F.Supp. 7, 8 (D.Md.1991); *Gott* at ¶ 20 (quoting the same). " '[J]urors are capable of determining whether the use of force in self-defense is reasonable * * *.' " *Id.*, quoting *Salazar* at 610. In sum, it is "within the province of the jury to evaluate

whether defendant had reasonable grounds to believe and an honest belief that he was in immediate danger of death or great bodily harm and that his only means of escape from such danger was by the use of deadly force." *Id.* at ¶ 22. We just recently followed *Gott* and held that, except in battered-woman and battered-child cases, expert testimony is not admissible to establish a self-defense claim. *State v. Stargell*, 2d Dist. Montgomery No. 26446, 2016-Ohio-5653, ¶ 51-52.

{¶ 31} The Ohio Supreme Court has carved out exceptions to this general rule in cases where the defendant suffers from battered-woman syndrome or battered-child syndrome as a result of abuse at the hands of the "victim." *See State v. Koss*, 49 Ohio Std.3d 213, 551 N.E.2d 970 (1990) (battered-woman syndrome), and *State v. Nemeth*, 82 Ohio St.3d 202, 694 N.E.2d 1332 (1998) (battered-child syndrome). The Court has said that in these cases Evid.R. 702(A) may be satisfied because expert testimony may help the jury determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger, by helping the jury understand these syndromes and helping dispel popular misconceptions that the jury may have about people who suffer from these syndromes. *See Koss* at 216.[1]

---

[1] "Expert testimony regarding the battered woman syndrome can be admitted to help the jury not only to understand the battered woman syndrome but also to determine whether the defendant had reasonable grounds for an honest belief that she was in imminent danger when considering the issue of self-defense. 'Expert testimony on the battered woman syndrome would help dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time. The expert evidence would counter any "common sense" conclusions by the jury that if the beatings were really that bad the woman would have left her husband much earlier. Popular misconceptions about battered women would be put to rest, including the beliefs that the women are masochistic and enjoy the beatings and that they intentionally provoke their husbands into fits of rage.' " (Citation omitted.) *Koss* at 216, quoting *State v. Hodges*, 239 Kan. 63, 68-69, 716 P.2d 563 (1986).

**{¶ 32}** Here, Dr. Melton's testimony does not fit the rationale given for the exceptions in battered-syndrome cases. Whatever problems Gray has, they are not the result of abuse by Mooty. Also, Gray does not mention any common misconceptions that Melton's testimony would dispel. He argues only that her testimony would help the jury understand why the events of his childhood might explain his extreme response to the alleged threat posed by Mooty.

**{¶ 33}** Furthermore, the trial court could have concluded that Dr. Melton's testimony was unnecessary or even irrelevant. If Gray's account of the murder was believed, the jury would have no difficulty understanding why Gray acted like he did; no expert explanation would be necessary. The Ohio Supreme Court held the same on similar facts in the battered-woman case of *State v. Sallie*, 81 Ohio St.3d 673, 676, 693 N.E.2d 267 (1998). In that case, the defendant asserted a claim of self-defense against a charge of manslaughter for shooting and killing her boyfriend. At trial, she gave her account of the shooting, which included her claim that he physically attacked her and, as he was choking her, threatened to kill her. In an ineffective-assistance-of-counsel claim on appeal, the defendant argued that counsel should have presented expert testimony on battered-woman syndrome because it was essential to explain why she initially obtained the gun that she used. But the Court disagreed and said that considering her account of the shooting, expert testimony on battered-woman syndrome was unnecessary to show an honest belief in the imminent danger of death or great bodily harm:

> The real issue in [the defendant]'s case was not whether she suffered

from battered woman syndrome, but whether [her] version of the facts was credible. If the jury believed events occurred as [she] claims, it could have properly determined she reasonably believed she was in imminent danger of death or great bodily harm and thus acted in self-defense.

On the facts as [the defendant] related them, the jury could make the determination [she] acted in self-defense regardless of whether [the boyfriend] had previously abused her, or whether the night [he] was killed was the first time he attacked [the defendant]. [Her] trial counsel might reasonably have concluded testimony on battered woman syndrome was simply not relevant under the facts of this case.

*Sallie* at 676. "[E]xpert testimony is inadmissible," said the Court, "if it concerns matters 'within the ken of the jury.' " *Id.*, quoting *Koss* at 216. Assuming that the defendant's account of the shooting is true, continued the Court, "expert testimony would be unnecessary to aid the jury in determining whether a woman being choked and threatened with death believed she was in imminent danger necessitating the use of force in self-defense." *Id.*

{¶ 34} The rationale underlying the *Sallie* holding applies here. Considering Gray's account of the murder, including his testimony that Mooty physically attacked him, expert testimony on the effects of his childhood abuse was unnecessary to show an honest belief in the imminent danger of death or great bodily harm. The real issue here was not whether Gray suffered from a psychological malady, but whether his version of the facts was credible. If the jury believed Gray's account of the murder, it could have determined that he reasonably believed that he was in imminent danger of death or great bodily harm and

accordingly acted in self-defense—regardless of whether he was abused as a child. Thus the trial court could reasonably have concluded that Dr. Melton's testimony on the effects of Gray's childhood abuse was simply not relevant here.

**{¶ 35}** "A trial court's ruling on evidentiary issues, including the admissibility of expert opinions, will not be reversed on appeal absent an abuse of discretion and proof of material prejudice." (Citations omitted.) *State v. Belton*, Ohio Sup. Ct. Slip Opinion No. 2016-Ohio-1581, ¶ 116. In this case, the trial court did not abuse its discretion by excluding Dr. Melton's testimony.

**{¶ 36}** The first assignment of error is overruled.

### III. Conclusion

**{¶ 37}** We have overruled both of the assignments of error presented. Therefore the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

Mathias H. Heck
Andrew T. French
Marshall G. Lachman
Hon. Steven K. Dankof