[Cite as *State v. Mitchell*, 2023-Ohio-3543.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-22-1166

    Appellee                                 Trial Court No.  CR0202001814

v.

Michael Mitchell Jr.                             **DECISION AND JUDGMENT**

    Appellant                                Decided:  September 29, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, II, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Michael Mitchell, Jr., appeals from the judgment of the Lucas

County Court of Common Pleas, convicting him of felonious assault, with a firearm

specification.  For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case

{¶ 2} On July 7, 2020, appellant fired four shots in the parking lot of Gino's pizza restaurant, in Toledo. The first shot struck J.D., who died shortly afterward. Appellant claimed that he fired the subsequent three shots as "warning" shots, based on his fear that J.D. would get into a car with someone else who might give him a weapon.

{¶ 3} Appellant was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02; one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D); and one count of felonious assault in violation of R.C. 2903.11(A)(1) and (D). All of the counts carried firearm specifications pursuant to R.C. 2941.145(A), (B), (C), and (F). The count of felonious assault in violation of R.C. 2903.11(A)(1) related to the first shot, which struck J.D. The count of felonious assault in violation of R.C. 2903.11(A)(2) related to the three shots fired after J.D. was struck by the first shot. Of the three later shots, one struck an occupied Lincoln Continental, and one or more struck an unoccupied Lexus.

{¶ 4} At trial, appellant requested a self-defense instruction for all of the charges, as well as an instruction on aggravated assault, as an inferior degree of felonious assault. The trial court granted the request for the self-defense instruction as to the felonious assault charge in violation of R.C. 2903.11(A)(1), but denied the request as to the felonious assault charge in violation of R.C. 2903.11(A)(2). The court also denied the request for the instruction on the inferior degree offense of aggravated assault.

2.

{¶ 5} The jury acquitted appellant of the murder charge and the felonious assault charge that was associated with the murder charge, but convicted him of the felonious assault charge in violation of R.C. 2903.11(A)(2) and (D). It is from this conviction that appellant now appeals.

## Statement of Facts

### The altercation and death of J.D.

{¶ 6} At trial, there was testimony that on the evening of July 7, 2020, J.D. told a relative that he was "going to get into it" at Gino's with someone he believed had mistreated his girlfriend. J.D. confronted appellant, first verbally and then physically, when appellant walked out of the store. J.D. swung at appellant several times before finally landing a punch that knocked appellant over. Four seconds after the initial swing, appellant responded by firing a single shot, hitting J.D in the chest. J.D. fell to the ground behind a parked Lincoln Continental. Appellant walked up to J.D. as J.D. was lying on the pavement, writhing on his back. Moments later, appellant began heading toward his truck. But before reaching his truck, he turned and went back to the area of the Lincoln, and then appeared to pick something up off of the ground. The Lincoln then slowly started to pull away. At about the same time, J.D. got to his feet and began running alongside the driver's side of the Lincoln, which was making its exit from the restaurant parking lot.

{¶ 7} Appellant, positioned himself behind the fleeing J.D. and fired three additional shots in J.D.'s direction. The Lincoln, which was clearly occupied at the time

3.

of the shooting, was later discovered to have blood and a bullet defect with "a big dent around it" on its exterior. An unoccupied Lexus was also struck by appellant's volley.

{¶ 8} The events were captured by various surveillance cameras, as well as a bystander's cell phone. J.D. was identified as wearing a white shirt, which revealed a blood stain as he stood up from the ground.

{¶ 9} J.D. died as a result of the gunshot wound. The autopsy of his body revealed that the bullet entered the left side of his chest through the sixth rib, traveled downward, grazed the bottom of his heart, and passed through his colon and left kidney before stopping in his lower back.

{¶ 10} Witnesses, including appellant, did not see J.D. with a weapon. No firearm was discovered in the parking lot, or in the vehicle that J.D. rode in to Gino's, or at the hospital where J.D. was treated.

**The testimony of K.A.J.[1]**

{¶ 11} K.A.J. was close friends with J.D., whom he described as a defensive lineman who was "NFL ready." On the night of the shooting, K.A.J. and J.D. went to play pickup basketball at the Skyway Gym, in the city of Oregon, Ohio. K.A.J. did not see appellant at the gym and had never met him before.

---

[1] K.A.J. testified by video deposition, which was played at trial and appears in the appellate record, but does not appear to have been transcribed.

{¶ 12} After leaving the gym, K.A.J. and J.D. drove to Gino's. J.D. talked with someone on the phone as they drove over, and K.A.J. himself was also talking on the phone. J.D. got out of the car and a few minutes later was shot.

{¶ 13} K.A.J. reviewed the surveillance video and identified his vehicle arriving in the Gino's parking lot at about 11:03 p.m. He also identified J.D. running toward K.A.J.'s car as appellant fired shots in J.D.'s direction. He testified that he was able to see the gunshots that appellant was firing, and that the shooter was not pointing the gun at the sky or toward the ground, but rather was pointing at J.D.

{¶ 14} K.A.J. got J.D. back in his car and drove to Toledo Hospital. J.D. was unable to communicate during the ride, and they arrived at an entrance which was locked due to COVID protocols. K.A.J. was attempting to break the door down when hospital security and police arrived.

**The testimony and cell phone recording of S.D.**

{¶ 15} Gino's patron S.D. was waiting in a car at the restaurant while her husband went inside to pick up their order. The parking lot was lit and the store was busy. S.D. was scrolling through Facebook when she heard a "pop." Assuming it was fireworks, she did not think much of it. She heard a second noise and turned to see two men "kind of wrestling." She started to record events on her phone, and more shots were audible on the recording.

{¶ 16} She testified that she saw a man wearing a white T-shirt running away while a man wearing a black T-shirt fired three shots at him. S.D. specified that the

5.

shooter did not fire the gun up in the air, but instead pointed the gun directly at the running man. She further testified that although the running man was alongside of a car, she did not see him try to get into the car; he was merely "running away from Gino's."

**Surveillance video**

{¶ 17} A surveillance video recording from the front of the store depicts individuals who were waiting in line begin to run into the parking lot at around 23:13:16 p.m. Seconds later, at about 23:13:18, J.D. can be seen falling to the ground. At 23:13:20, appellant can be seen standing right behind J.D., as J.D. lay struggling and grabbing his chest. Appellant then leaves the camera view. J.D. is seen getting to his feet at about 23:13:26, and at 23:13:28, appellant reappears on the screen, behind the vehicle and in close proximity to J.D.

{¶ 18} Additional surveillance video depicts appellant chasing J.D. as he runs behind a Lincoln that is moving forward in the Gino's parking lot. Appellant can be seen pointing a gun at the individual who is running away, and two muzzle flashes appear on the screen. Appellant is then seen running to a red truck that he gets into and drives away at about 23:13:44.

{¶ 19} Another surveillance video depicts the interior of the restaurant, with a view of the front door. J.D. is seen standing outside the entrance of the store as the Lincoln pulls up to the entrance and a woman gets out to wait in line outside the door. Appellant walks out of the restaurant at about 23:12:55, at which point appellant and J.D. begin engaging with one another. At 23:13:12, J.D. throws the first punch, and at

6.

23:13:16, the muzzle flash from the first shot can be seen. The Lincoln begins to pull forward at about 23:13:28, and at 23:13:30, an individual in white can be seen running in the same direction as the Lincoln. Individuals inside the restaurant peered out of the windows but ducked down or began to take cover at about 23:13:31.

{¶ 20} Still more surveillance video was taken from inside the store, focused on the front entrance. Here, appellant can be seen talking on the phone and walking out of the restaurant at 23:12:45. Individuals outside the glass doors are seen moving rapidly, and at 23:13:16, an individual waiting in line inside the door moves suddenly off screen. Other individuals came to look out the door, but quickly retreated at around 23:13:31.

{¶ 21} Toledo Police Detective Jeffrey Sharp testified that based on the reaction of bystanders and the muzzle flash, the first gunshot appears to have been fired at about 23:13:16, and the second set of gunshots appear to have been fired at around 23:13:32.

### Shell casings

{¶ 22} Four shell casings were discovered at the scene. The shell casings and the bullet removed from J.D.'s body were compared to a test-fire of appellant's gun. The comparison confirmed that appellant's gun fired the shots.

### 911 call

{¶ 23} A passerby called 911 and reported seeing a heavy-set male with a white shirt, who had been shot in the chest, lying on the ground, with a second male, in a black T-shirt, standing over him.

7.

## Mitchell interview

{¶ 24} In a pretrial interview, appellant said that he knew J.D. from high school but had not seen him in a year and a half before the day of the shooting. He stated that he had seen J.D. earlier that day at an open gym in Oregon, Ohio, without any apparent problems. When they encountered each other at Gino's, however, J.D. said, "I don't fuck with you," "my baby mamma said you tried to rape her," and "I should kill you right here." Appellant said that J.D. struck him and that when appellant jumped back, J.D. "reached for something." As a result, appellant fired his gun. Appellant stated that when J.D. got up and started running toward the car, he fired "two more warning shots," because he did not know who was in the car. He stated that he fired three shots in total.

## Mitchell's trial testimony

{¶ 25} At trial, appellant testified that he had seen J.D. earlier in the day at an open gym, but that he did not talk to him. He stated that as he exited Gino's restaurant, J.D. said, "I don't fuck with you," which appellant interpreted to mean that J.D. did not like him. According to appellant, J.D. said that his "baby mama" had accused appellant of trying to rape her, and that he "should kill" appellant. Appellant testified that J.D. had his fist balled up and was rocking back and forth, before he finally began to swing. Despite the exchange, appellant denied ever being angry with J.D. on the night of the shooting.

{¶ 26} Appellant admitted that J.D.'s first successful blow sent him falling into a nearby garbage can. But appellant said he fired his gun because J.D. was "fidgeting"

8.

with his pockets. Appellant did not warn J.D that he was armed or show him that he had a gun before firing. He further stated that he was an arm's length, "if that," from J.D. when he fired the first shot. He said that he did not "point" the gun, but rather "just pulled it out and fired."

{¶ 27} Appellant said that he took his gun into Gino's because there were "a lot of people out there, a lot of cars and commotion." He acknowledged that his concealed carry license required him to report to police if he shot someone, but he stated that he never did "see" that he had hit J.D., despite J.D.'s fall to the ground onto his back after the first shot. Appellant claimed that he learned that J.D. was shot a couple of hours after the incident, through social media.

{¶ 28} Appellant stated that after firing the first shot, he went toward his truck but turned back to retrieve his cell phone. He admitted as he watched the video that while he stood over J.D., J.D. was moving around, and that "it could have been a possibility that he got hit," but he "didn't see anything that indicated that the bullet hit him at that time." He specifically denied being mad at J.D. at that time or at any time that night.

{¶ 29} Afterward, appellant said that he started running toward his truck and that he fired three more shots as he ran. He denied that he was chasing down J.D. or "trying to run and shoot him as he was running away," but he conceded that he did not fire straight up into the air. He explained:

> I only fired those shots when he was running cause I was still
> scared because he had got back up after the first altercation.

9.

So, and I didn't know if I hit him, and he was running along side of that car, so that's why I fired, like I said, the three warning shots because I didn't know if he was getting in that car. I didn't know if anybody in that car was with him, could have handed him anything. I just didn't know at that time. So it was just out of fear that's what I did. I wasn't aiming at him. I wasn't chasing him down trying to hit him. I was running to my car and I was shooting those warning shots.

Appellant stated that he wanted to communicate that he was still armed and that he did not want any more trouble.

{¶ 30} Appellant claimed that he sustained a knot on his temple as a result of falling against the trash can, but did not require any medical treatment. He admitted that he did not suffer any significant injury in the altercation.

### Assignments of Error

{¶ 31} Appellant asserts the following assignments of error on appeal:

I. The trial court abused its discretion by denying Appellant's request for a self-defense jury instruction on Count 2, Felonious Assault.

II. The trial court abused its discretion by denying Appellant's request for a jury instruction on the inferior degree offense of aggravated assault.

Analysis

## Jury Instructions

{¶ 32} Appellant alleges in both his first and second assignment of errors that the trial court abused its discretion in denying certain of appellant's requests for jury instructions.

{¶ 33} Generally speaking, a trial court must give the jury correct and comprehensive instructions that adequately reflect the issues argued in the case. *State v. Lane*, 6th Dist. Erie No. E-22-035, 2023-Ohio-1305, ¶ 13, citing *State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992). "Requested jury instructions should ordinarily be given if they are correct statements of law that are applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction." *Miller v. Defiance Regional Med. Ctr.*, 6th Dist. Lucas No. L-06-1111, 2007-Ohio-7101, ¶ 40. (Additional citation omitted.) An appellate court reviews the trial court's refusal to provide a requested jury instruction for an abuse of discretion. *Lane* at ¶ 13, citing *State v. Heiney*, 2018-Ohio-3408, 117 N.E.3d 1034, ¶ 133 (6th Dist.).

## Self-Defense

{¶ 34} In his first assignment of error, appellant argues that the trial court abused its discretion in denying his request for a self-defense jury instruction in connection with the charge of felonious assault that was related to his final three gunshots.[2]

---

[2] It is undisputed that the trial court properly instructed the jury on self-defense in connection with the charge of felonious assault related to the first shot appellant fired. In

**{¶ 35}** R.C. 2901.05(B)(1) provides that "[a] person is allowed to act in self-defense * * *." "The elements of self-defense differ depending upon whether the defendant used deadly or non-deadly force." *Lane* at ¶ 14, citing *State v. Baker*, 2023-Ohio-241, 207 N.E.3d 78, ¶ 27 (6th Dist.). (Additional citation omitted.). "Deadly force" is "any force that carries a substantial risk that it will proximately result in the death of any person." R.C. 2901.01(A)(2). "The use of a gun constitutes deadly force." *State v. Barker*, 2022-Ohio-3756, 199 N.E.3d 626, ¶ 21 (2d Dist.), citing *State v. Dale*, 2d Dist. Champaign No. 2012-CA-20, 2013-Ohio-2229, ¶ 15.

**{¶ 36}** In order to succeed, a claim of self-defense by means of deadly force requires that: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger. *Lane* at ¶ 15, citing *State v. Messenger*, -- Ohio St.3d --, 2022-Ohio-4562, -- N.E.3d. --, ¶ 14. (Additional citation omitted.).

**{¶ 37}** As to the first element, "[i]t is well established that a person cannot provoke a fight or voluntarily enter combat and then claim self-defense." *State v. Canankamp*, 3d Dist. Auglaize No. 2-22-02, 2023-Ohio-43, ¶ 38, quoting *State v. James*, 2d Dist. Montgomery No. 28892, 2021-Ohio-1112, ¶ 21.

---

fact, that instruction served as the basis for appellant's acquittal on both the murder charge and the second charge of felonious assault.

12.

{¶ 38} "The second element of a self-defense claim is a combined subjective and objective test." *State v. Hunt*, 8th Dist. Cuyahoga No. 111892, 2023-Ohio-1977, ¶ 26, citing *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997). Thus, "self-defense 'is placed on the grounds of the bona fides of defendant's belief, and reasonableness therefore, and whether, under the circumstances, he exercised a careful and proper use of his own faculties.'" *Thomas* at 330, quoting *State v. Sheets*, 115 Ohio St. 308, 310, 152 N.E. 664 (1926); *see also State v. Reyes-Figueroa*, 8th Dist. Cuyahoga No. 108609, 2020-Ohio-4460, ¶ 27 ("Often missing from quotations of the self-defense elements is the requirement that the force used be reasonable."). "A person is only privileged to use that force *which is reasonably necessary* to repel the attack." *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 8. (Emphasis added.)

> In other words, a defendant must show that 'that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat.' [*State v. Hendrickson*, 4th Dist. Athens No. 08CA12, 2009-Ohio-4416,] ¶ 31, citing *State v. Palmer,* 80 Ohio St.3d 543, 564, 687 N.E.2d 685 (1997). 'If * * * the amount of force used is so disproportionate that it shows an "unreasonable purpose to injure," the defense of self-defense is unavailable.' *State v. Macklin,* 8th Dist. Cuyahoga No. 94482, 2011-Ohio-87, 2011 WL 208315, ¶ 27, quoting *State v. Speakman,* 4th Dist.

13.

Pickaway No. 00CA035 (Mar. 27, 2001). *Accord State v. Kimmell,* 3[]d Dist. Wyandot No. 16-10-06, 2011-Ohio-660, ¶ 20, quoting *Hendrickson* at ¶ 33 ('Self-defense * * * is inappropriate if the force used is "so grossly disproportionate as to show revenge or as criminal purpose."'). '[I]t is only when one uses a greater degree of force than is necessary under all the circumstances that it is not justifiable on the ground of self-defense.' [*State v. McLeod,* 82 Ohio App. 155,] 157[, 80 N.E.2d 699 (1948)].

*State v. Waller,* 4th Dist. Scioto Nos. 15CA3683 and 15CA3684, 2016-Ohio-3077, ¶ 26.

{¶ 39} Finally, as to the third element, pursuant to the most recent amendments to R.C. 2901.09(B), "a person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B); *see also Lane* at ¶ 15.

**Burden of Proof**

{¶ 40} Where a person accused of an offense involving force presents evidence "that tends to support that [he or she] used the force in self-defense * * *," the state "must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *." R.C. 2901.05(B)(1). The Supreme Court of Ohio, clarified the defendant's burden of production as follows:

14.

[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense. * * * [I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.

*Messenger* at ¶ 25.

{¶ 41} "In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered." *State v. Davidson-Dixon*, 2021-Ohio-1485, 170 N.E.3d 557, ¶ 20 (8th Dist.), citing *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 42 (8th Dist.). (Additional citations omitted.) Where there is conflicting evidence on the issue of self-defense, the instruction must be given to the jury. *Davidson-Dixon* at ¶ 20. But "[i]f the evidence generates only a mere speculation or possible doubt, the evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *State v. Melchior*, 56 Ohio St.2d 15, 20, 381 N.E.2d 195 (1978).

{¶ 42} "[A] defendant's bare assertion that he acted in self-defense will be insufficient." *Davidson-Dixon* at ¶ 20, citing *Jacinto* at ¶ 47. (Additional citation omitted.) Those assertions "must be coupled with supporting evidence from whatever

15.

source and of a nature and quality sufficient to raise reasonable doubt as to guilt."
*Davidson-Dixon* at ¶ 20, citing *Melchior* at 20. (Additional citation omitted.)

{¶ 43} In the instant case, the trial court told the attorneys that a self-defense instruction was not supported by the evidence, and that any imminent danger abated once J.D. began to run away.

{¶ 44} Looking to the elements of self-defense, we find that there was legally sufficient evidence to show that appellant was not at fault in creating the situation that gave rise to the affray. Ample, uncontroverted evidence showed that it was J.D., and not appellant, who initiated both the non-physical and the physical aspects of the confrontation. Thus, appellant has satisfied his burden of production as to the first element of self-defense.

{¶ 45} As to the third element, requiring that the defendant did not violate any duty to retreat or avoid the danger, we are mindful that the current version of R.C. 2901.09(B) does not impose a duty to retreat so long as the defendant is in a place where he lawfully has a right to be. In this case, the parties do not dispute that appellant, in his capacity as a Gino's customer, was lawfully where he had a right to be. Thus, appellant has satisfied his burden of production as to the third element of self-defense.

{¶ 46} Finally, we focus our attention on the second element of self-defense, regarding the question of whether appellant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force. Appellant in the instant case testified that he

was acting in self-defense; he claimed that he fired the shots because he was scared when J.D. got up and started running alongside the Lincoln, because he did not know whether anyone in the Lincoln "was with" J.D. and whether such person "could have handed him anything." This testimony alone does not warrant a self-defense instruction.

{¶ 47} The video evidence makes clear that when appellant returned to the area of the Lincoln, the victim stood up and moved toward the car to take shelter from the man who shot him. Appellant was in a good position to see what was happening and that the victim was in distress. Nevertheless, appellant, with his arm stretched straight, pointed his gun toward J.D. and began firing at J.D. while J.D. was running away. As mentioned by the trial court, any threat of imminent danger abated once J.D. began to flee. *See State v. Collins*, 10th Dist. Franklin No. 19AP-373, 2020-Ohio-3126, ¶ 42 (finding that any threat of imminent danger abated once the alleged attacker began running away). Further, there was no evidence or testimony to suggest that the driver of the car was in any way connected to J.D. Nor was there any evidence or testimony to suggest that the driver, during his exit, made any maneuver that could have been perceived by appellant as an effort to hand something, such as a weapon, to J.D.

{¶ 48} Based on the record before this court, we find that the evidence produced and relied upon by appellant only generated mere speculation. There was no evidence that tended to support that appellant's use of deadly force was reasonable with respect to his final three shots; rather, it was grossly disproportionate to the continually abating danger. Accordingly, the trial court did not abuse its discretion in denying appellant's

17.

request for a self-defense jury instruction.  Appellant's first assignment of error is found not well-taken.

## Inferior Degree Offense of Aggravated Assault

{¶ 49} Appellant argues in his second assignment of error that the trial court abused its discretion in denying his request for a jury instruction on the inferior degree offense of aggravated assault.

{¶ 50} Under R.C. 2903.11(A)(2), felonious assault, "[n]o person shall knowingly * * * cause or attempt to cause physical harm to another * * *."  Under R.C. 2903.12(A)(2), aggravated assault, "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * [c]ause or attempt to cause physical harm to another * * *."

{¶ 51} "Aggravated assault is an offense of an inferior degree of felonious assault." *Lane* at ¶ 33, citing *State v. Mack*, 82 Ohio St.3d 198, 200, 694 N.E.2d 1328 (1998).  "'[I]n a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury.'" *Mack* at 200, quoting *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph four of the syllabus.

{¶ 52} "To be 'serious' the provocation must be reasonably sufficient to bring on extreme stress and [to] incite or to arouse the defendant into using deadly force." *Lane* at

18.

*¶* 34, citing *Mack* at 200. (Additional citation omitted.) There is both an objective and subjective component to this requirement. *Lane* at ¶ 34. To satisfy the objective component, the provocation "must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). Where the evidence of provocation is insufficient, such that no reasonable jury would conclude that the defendant was reasonably provoked by the victim, the court must decline to instruct the jury on aggravated assault. *Lane* at ¶ 34. "However, if the objective standard is met, 'the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id.* at ¶ 34, quoting *Shane* at 635.

{¶ 53} Ohio courts considering what constitutes sufficient "serious provocation" have found that past incidents or verbal threats are not sufficient; words are not sufficient; and a victim's simple pushing or punching the defendant is not sufficient. *Lane* at 35, citing *Mack* at 201, and *State v. Bryan*, 4th Dist. Gallia No. 03CA3, 2004-Ohio-2066, ¶ 24.

{¶ 54} Regarding the emotional state necessary to constitute sudden passion or a sudden fit of rage, Ohio courts have found that confusion or fear alone is not sufficient. *Lane* at ¶ 36, citing *Mack* at 201, and *State v. Tantarelli*, 10th Dist. Franklin No. 94APA11-1618, 1995 WL 318730, *4 (May 23, 1995). "And where a defendant testifies that he was merely afraid and no evidence exists that he actually acted under a sudden fit

19.

or passion or rage, a court does not abuse its discretion by refusing to provide an instruction on aggravated assault." *Lane* at ¶ 36, citing *Bryan* at ¶ 26, and *State v. Jones*, 2018-Ohio-239, 104 N.E.3d 34, ¶ 19 (4th Dist.).

{¶ 55} Defense counsel requested an instruction on aggravated assault because he believed that there was a question of fact as to whether appellant acted under the influence of sudden passion, brought on by serious provocation by J.D. According to appellant, "[t]he evidence at trial was that Appellant was not angry with J.D. but was nonetheless aroused by sudden passion brought on by J.D.'s threat to kill Appellant and a physical assault." Appellant maintains that sufficient evidence was presented to the jury of "'serious provocation' from J.D. to the extent that the jury could have found him not guilty of a felonious assault but guilty of an aggravated assault."

{¶ 56} The trial court declined to instruct the jury on aggravated assault, in part on the grounds that appellant's fear for his own personal safety did not constitute "sudden passion or a fit of rage" as contemplated by the aggravated assault statute. Specifically, the court found that a fistfight was not reasonably sufficient to bring on sudden passion or a fit of rage reasonably sufficient to incite a person into using deadly force, and, further, that none of the evidence at trial indicated that appellant had in any way lost control over himself or that he was otherwise significantly affected by emotion.

{¶ 57} We agree with the trial court that there was no evidence that J.D. seriously provoked appellant to fire the last three shots. J.D.'s running away from the scene alongside the Lincoln did not constitute provocation under Ohio law, nor did his previous

20.

words to appellant or even his punch. Even if J.D. did provoke appellant, there was no evidence that appellant acted under a sudden fit of passion or rage; his testimony was that he acted only out of fear, which is insufficient. Accordingly, the trial court did not abuse its discretion in failing to instruct the jury on aggravated assault, and, therefore, appellant's second assignment of error is found not well-taken.

## Conclusion

{¶ 58} Because the trial court did not abuse its discretion, either in refusing to instruct the jury on self-defense with respect to appellant's final three shots or in refusing to instruct the jury on the inferior degree offense of aggravated assault in connection with his charges for felonious assault, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J. _____

_____
JUDGE

Myron C. Duhart, P.J. _____

_____
Charles E. Sulek, J. _____ JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.